You're going to argue in United States v. Vasquez-Rosales and Guzman Padilla? Correct. And who are you? I'm Sean Kajian. I was trial counsel for Mr. Vasquez as well as representing here. And I'll speak for Mr. Guzman. But, of course, both these cases consistent with the court's order to prepare these arguments together. The facts in this case, Vasquez and Guzman's and Mr. Cota's, are strikingly similar. In both cases, the drivers were using the recreational campgrounds. In fact, in this case, in Vasquez's case, Agent Baccalini saw parked vehicles, including six or eight trucks with campers or RVs, as well as individuals camping. It's a recreational campground that the sand dunes are. Many innocent people use the sand dunes. Many innocent people use the sand dunes without red flags on their vehicle. Agent Harrington admitted as much at ER-2 at page 50 in the Cota case. Both vehicles in this case did not violate the speed or create any, sorry, or cause any other vehicle code violations. Both vehicles passed by the officers, and the officers did not notice anything wrong with the vehicles. There was testimony that people use unmodified SUVs in the campgrounds. People have seen this before. A local user of the recreational campgrounds testified in Vasquez's case at the district court level, and he said as much. So it's not unusual to see an unmodified vehicle. It's not unusual to see vehicles without red flags. In both cases, the officers followed the vehicle for 10 miles on Highway 8 and did not use their sirens or lights to effectuate a stop, and they could have done that if this car, if the officers, as the Governance Council says in its briefs today, that they were certain that there was an illegal entry and they were certain that these cars both were smuggling drugs, and they could have effectuated a stop much sooner. But what happens here? Well, they don't have to be certain. Well, for probable cause, they don't. But for an extended border search, the case law is that, to be specific, reasonable for an extended border search, an extended border search is valid if customs officers can determine with reasonable certainty that any contraband which might be found in the vehicle was aboard the vehicle when it crossed the border. And that's from United States v. Perez, 644 F. 2nd, 1299, 9th Circuit, 1981. But to answer Your Honor's question, reasonable certainty is a stricter standard than probable cause. And that's at page 1302. As to whether there had been a border crossing. That's right. That's the fact that they have to be reasonably certain about. Correct. And here in the Vasquez case at ER 108, the question was, now, to be clear, you didn't see this car cross the border, did you? No, I did not. You didn't see it loaded with anything illegal, did you? No. Further, to the extent that even if it is a border search or the equivalent or functional equivalent, to allow them to do a carry stop or a temporary detention, the officer in this case at page 103, sorry, page 153, what you did with the spike strip on this vehicle in this case, would you classify that as a brief investigatory stop? No. So if it's not a brief investigatory stop, and clear from the record that they can't say that they're reasonably certain because they didn't see the cars cross the border. And so what's left is probable cause should be the standard to forcibly stop someone. And here we have no evidence of either car in either case trying to avoid the police, or sorry, avoid the border patrol. They're using the recreational campgrounds from an objective perspective. Just like any other recreational innocent user, there are many innocent people in the valley, in the Imperial Valley, that use these campgrounds. And so it's certainly not fair to allow the border patrol to use a spike strip in circumstances like this. I agree. The border patrol, generally speaking, if someone's trying to avoid the authorities or is driving erratically, in those circumstances, if they have, and therefore they're observing the vehicle committing these, this type of, exhibiting this type of driving behavior, it would likely be fair to use a spike strip in that situation. But not in this situation. Not under these facts. And so for these reasons, we ask that the court reverse the district court's finding in both cases. What was the evidence that would indicate that your client's vehicle came from the south? From what I gather, it was simply a hunch. The agents see the vehicle in the campgrounds, and they assume that the person has crossed the border. Because otherwise, this vehicle is behaving and using the campgrounds just like all other vehicles, just like all other recreational users. In my case, in the Vasquez case. Was there a stop at the campgrounds and a picnic and all that? That's not in the record. I think the first time they see the vehicle in this case is when the vehicle's driving and using a man-made path in the A7 Valley, which is perfectly fine and perfectly legal, just like all other recreational users, coming towards Highway 8. And then, like I explained, 10 miles later, a spike strip is used without first operating the sirens or without first trying to light up the vehicle. All right. Thank you. Thank you. Our intention was to divide some of the time. What? Our intention was to divide some of the time among us. I just wanted to briefly address two issues. I'm Ellis Johnson, again, counsel for Mr. Guzman-Padilla in an instant matter. I wanted to address first with respect to the unreasonable use of force. There has been a claim by the government that suppression is not the remedy, and they would cite to Hernandez-Garcia, which said at that time, when that case was decided, that there was no precedent, according to that court, to so hold. Well, there's been developments in the law since that time that I think warrant suppression as the remedy. First, most recently in the hearing decision by the Supreme Court, it said that suppression is appropriate where it has an appropriate deterrent value. And when that's read in conjunction with Hudson, which was the knock-and-announce case where the Supreme Court said that suppression wasn't necessary, Justice Kennedy, the fifth and controlling vote of the Hudson court, said had we had a situation where there was, I believe, a demonstrated pattern of violations, there would be reason for grave concern. So as opposed to a case where there's a mistaken misstep, the Hudson case, we have a case where there is a pattern in practice of using these spike strips. They just said it is our plan from the minute we see one of these cars to spike strip them, that suppression is the appropriate remedy. And this Court's decision in Ann Kinney is a case where it says if the stop is the causal nexus of, or if the use of force is the causal nexus of the violation, then suppression is the appropriate remedy. Well, the use of force wasn't necessarily the causal nexus. If they had the right to stop the vehicle, under some theory, border search, Terry stop, PC, the fact that they stopped the vehicle in an inappropriate manner doesn't mean that the stop itself was illegal. Well, I think in this instance, had they stopped him with lights and then cut the tires to see if there were drugs in the tires? Well, no. What about just stopping them with lights and seeing the dope in the car? Well, they didn't do that. The causal nexus in this case was that they used a spike strip to stop the car. Well, no. But wait a minute. And I don't mean to split hairs with you, but they had some theory. I don't think it could be seriously argued in this case that there wasn't any basis for stopping the car. The quarrel here is with the means that were used to stop the car. So had a stop been made by lawful means, the drugs would have been discovered. There's nothing in this record that suggests otherwise, correct? No, I agree with you on that. And this sounds like a logic class in college. I don't mean it to, but the stop was legal. And had a legal stop been made, there would have been discovery of the drugs. What was illegal, if we accept your theory, was the means used to effect the stop, not the stop itself. I don't know if they can be separated. And I didn't get an A-plus in logic class. Neither did I. But no, but I can say this. I can say this. If that's the theory of what we mean by causal nexus, if it's can you stop them, then the means by which you stop them don't warrant suppression, then these officers easily could have shot out the tires. They could have shot at Mr. McClellan. Right. But that gets you into Hudson. And I'm not, you know, this is, Hudson's a case, the ramifications of which are going to have to play out over time. But the point that the Court's making there is if you don't comply with knock and announce, or as we call it in California, knock notice, that doesn't get you suppression. And then Justice Kennedy says, well, yeah, but if there's a pattern of abuse, then we may have a problem. Here the means may not have comported with Fourth Amendment law, but the stop itself, which is what produced the contraband, was okay. So, I mean, I'm not sure where this comes out. I'm just saying I don't think it's a, I don't think you clearly win on that. Well, I think that if Justice Kennedy's opinion has any meaning, where there is a pattern in practice and there's no dispute in this case that there is, that suppression should be the remedy. So I'll end with that on the unreasonable use of force. But with respect to probable cause, the government did cite, and I just wanted to mention this for benefit of the Court, that, and again, I think it's weighed this argument. It raised the new statute that it believes was violated, or at least that there was probable cause to believe was violated, and that was 19 U.S.C. 1433 and 1436. However, 1436, which imposes the penalties, imposes only misdemeanor liability for an intentional entry into the United States. It does become a felony liability if the vehicle contains contraband, but this Court would have to find that there was probable cause to believe that the contents of the vehicle was, in fact, contraband for it to be a felony. The reason that's important is this offense is completed once the person crosses the border, and this Court has held in Grigg that you cannot have a warrantless arrest or stop for misdemeanor unless the crime itself involves some sort of threat to the public. So 1436, as applied to this case, is simply misdemeanor liability. More importantly, it requires an intentional violation, and as I was explaining earlier, there's not probable cause that someone intentionally tried to enter the United States. In fact, if you're driving along the border road and, you know, come to a sand dune and go around it, you haven't intentionally violated 1433 or 1436. And we'll reserve the rest of our time for rebuttal. Was your client in this matter accompanied by another vehicle? In this case, I do not believe that that's so, Your Honor. In Mr. Guzman-Padilla's case, my client, Mr. Guzman-Padilla, was the passenger in Mr. Kajian's client's vehicle, Mr. Vasquez, I believe is his name. And in Cotamore, Mr. Cotamore was the only individual in the vehicle. In the first case? First case, yes. Which you argued was your client's vehicle accompanied by another vehicle? It was not. What the agents testified to, in all fairness, is that he saw two all-terrain vehicles, like four-wheel motorbike-type vehicles, on tops of different dunes before Mr. Cota came to the valley, I guess five to seven minutes before. But he wasn't accompanied by the ATVs. And the reason I think that that's important is the agent's testimony was these ATVs, to him, raised his suspicions, and the Court relied on that in its reasonable suspicion analysis. But on cross-examination, he said, well, really the scouts do a lot of different things that I didn't see in this case. He says, I see them talking on radios, I see them using binoculars, I see them drive down into the campground to look for people like me, and I'm referring to the agent who was concealing himself. And he also said that they will lead the vehicles, meaning like the vehicle Mr. Cota was driving, that scouts will lead them out of the valley. None of those things happened in this case. Instead, he said that the ATVs going to the tops of these dunes was just like what recreational users do. It's called high-pointing, going to the highest point. And so I think that to the extent that the government would want to rely on that for probable cause analysis, it's a little lacking based on the agent's own testimony. All right. Thank you. Thank you. Good morning again, Your Honors. Mark Rahe for the United States. Let's talk about probable cause in the Vasquez-Rosales case. My opponent came up. This is sort of a pattern I noticed in the reply briefs. I appreciate Giselle's defense of his client, but you have to acknowledge certain facts in this record. It's never been done in the briefing. It still hasn't been done today, Your Honor. Again, this place, without a doubt, notorious for drug smuggling, the arrests show it. There was a near certainty, almost an absolute certainty, that these cars had just come from Mexico. And again, whether you decide this case under the border search rationale or not, that is still the government's number one point for probable cause. Now, Mr. Kajian points out that the officer said he did not actually see the border crossing. That's not disputed, Your Honor. But what the evidence shows is that, and they testified, Agent Battaglini testified repeatedly, this, he was almost absolutely certain. This was the only reasonable explanation for this vehicle being where it was. And why? A whole constellation of factors. First of all, undisputed that the vehicle in this case not modified in any way. It didn't have oversized tires. It didn't have a lifted suspension. And despite one of the arguments that, oh, there could be this road near the border that they could drive on, even with that, I didn't find that anywhere in the record, Your Honor. And, in fact, Agent Battaglini testified at great length that he's been a Border Patrol officer for many years. He, in fact, used to drive Ford Expeditions, as did other fellow Border Patrol agents. They testified if they're not modified, you can't reach this spot where this vehicle was first seen without coming from Mexico. And we know they didn't come from Mexico because these areas have been under surveillance for hours. And these are areas on this particular case that we're talking about now. I mean, the first case is June 14th in the Imperial Valley, 110 degrees. My mom lives out in Palm Desert. I know how hot it gets out there. People aren't out there. This was the only car in the dunes. The case we're talking about now, Super Bowl Sunday. The agents testified there was no traffic in the area. So, Mr. Kajan, my point to you, oh, there was a few cars parked at the campground. We don't dispute that. That's on the paved portion of the road where people camp. What the agents testified to was that in the hours before, they didn't see anything. And it wasn't just them. There's all kinds of things going on. In the first case, Cote d'Amour, there's a supervisor who's manning a remote video camera. No reports the entire day. In the case now at Bard, the defendants testified, or the government agents, you had Agent Blake. He was at the Gordon's Well Midway Campground area to the west. He didn't report anybody that whole day. You have further testimony that it's the habit and custom of Border Patrol officers, whenever they find somebody, to report his vehicles because they're out in these godforsaken areas by themselves, they want to let their other agents know. No testimony of this whatsoever. There's also testimony that there's a sensor on a bridge that the car would have had to pass had it come from the Gordon's Well Midway Campground area. It never went off. There was testimony that the only one. There was a remote sensor on a bridge. I mean, one of the points defense tried to make was that, well, this vehicle could have come another way than south from Mexico. This point was explored. Our agent, Agent Babelini, testified that if you were to come from the Gordon's Well area, not only was Agent Blake on patrol there, there was a sensor on a bridge, and when somebody crosses it, it triggers a camera operator. And there were no reports of any such trigger in that entire day. And then it goes on. Two Yuma Border Patrol agents drove their vehicles into the A7 Valley, which was the precise valley at issue in the Vasquez-Rizal-Escuzman-Padilla case. I think a few hours before this happened, they didn't see anybody. So there's nobody's, there's just no way these cars can get where they are. I mean, if I were to draw an analogy, there's, I don't know, maybe there's another door. There's one door to this courtroom. If I started this argument and there was nobody behind me, and then a few minutes later, I look and I see three people, I know with almost absolute certainty they came through the door. So that's a point I know. I don't want to make it too simplistic, but it is an important point here. And the defense continuing in their reply briefs, they keep coming back to the fact, oh, the agents didn't actually see the crossing. Well, they didn't have to. And, in fact, even if you go to border search rationale, in the case of United States v. Dobson, this court held, in as many words, you don't have to actually witness the crossing. And the only point I do want to make, too, with this border search, you have this map. This is the blowup run from the Cote d'Amour case. We have a smaller one in the Vasquez-Rosales cases. Your Honor, there's nothing out here. There aren't cities. There's no towns. There's no sidewalks. There are no people. There are no 7-Elevens. There's nowhere people would stop. And for the defense to even entertain a supposition that somebody must have stopped in these places, it's not reasonable, and that's not what the law requires.  Let's talk about some more facts. I represent, in the Cote d'Amour case, I think the government has probable cause in spades. If you believe that, there's twice as much evidence here. At the government's response brief at pages 32 through 33 we delineate 12 specific factors that go to probable cause. Aside from the fact that it's notorious for drug smuggling, aside from the fact that these agents were reasonably certain that this vehicle had just crossed, the vehicle didn't have the Imperial Sand Dunes permit. I think that's it. Supplemental action. The lawyer didn't have what? A permit for the Imperial Sand Dunes. Okay. In Vasquez-Rosales. I'm slowing down. Exactly. I'm going to try to calm it down here. I had a good elocution teacher in high school. And not that I was a fast talker, but you know, Paul, how the President speaks, you hear every word, right? This is true. That's what you want to do. I appreciate it, Your Honor. And I think with the three cases here, maybe I feel I have so much to say and I want to get it all in on time, but I will bring it down. Not only did they not have that permit, in the second case, as in the first one, they didn't have that orange or red safety flag. Now, defense counsel came up and said, oh, there was testimony that other cars don't have that flag, too. Well, let me tell you, there was actually, in the Kodamora case, that's for record volume 2, page 55, on redirect, the agent said the majority of cars still do bear that flag. Even aside from that, I think the response is a non sequitur. It's pretty well established that the police can pull over a car if its tags are expired. It's probably pretty well settled that there could be thousands of cars on the streets with their tags that aren't up to date. Just because somebody else might also be in violation of the law doesn't detract from this factor, providing probable cause in this case. So that argument doesn't bear weight. An additional fact in this case, the Vasquez-Rizal's, this car had Mexican license plates, Baja, California. And even though, obviously, the border adjoins this area, there was testimony from Agent Badalini at Vasquez Excerpt of Records, pages 51 and 159, that Mexican license plates are very rare in the sand dunes, in the recreation part. This testimony was not disputed. There's also a fact that in this Vasquez-Rizal's case, the vehicle was driving too fast for the terrain. Testimony that was going 20 to 25 miles an hour. It's a washboard, rutted surface. Agent Badalini testified, again, from his five years of experience, if you go over five miles an hour on these roads, you're going to tear up your truck. Now, one of the points that came up in the defense presentation, they did call a witness in the Vasquez-Rizal's case. His name was Robert Davidson. He was a recreational user of the sand dunes. I think he gets out there four times a year. The district court heard his testimony. And he tried to also suggest, well, there might have been a couple routes to which this vehicle could have got to where it was first seen that didn't involve coming from Mexico. But both of them were discounted. One of them, he talked about a road from Winter Haven from the east. He later admitted on cross-examination that he hadn't traveled in a couple years, and it was established that there had since been put up steel barriers there. So that takes care of that. He also testified, well, it's possible to come from the east or the west at the Gordon's Will Midway Campground area, and I alluded to that briefly earlier. But Agent Baleeni came back and said, we had an agent there, Agent Blank, on surveillance. He never reported anything. We had that remote sensor on the bridge. It was never triggered. And I've been driving Ford Expeditions for five years. My fellow agents have. Unless they're modified, we can't do this. And that's why we have a separate unit called the ATU because they can get to those areas. After hearing all that evidence, what the defense didn't tell you, the district court made a credibility finding. It said, look, I accept what Mr. Davidson has said for its face value, but I believe that Agent Baleeni is more credible because instead of going out there four times a year for recreating, he testifies that he's on duty there almost five or six days a week. And he was in this unit called the STAT unit at the time of this case. Immediately before that, he was in the ATV unit. And Agent Baleeni testified. In both of those units combined, he's out on the Imperial Sand Dunes on almost a daily basis. The Imperial Sand Dunes because he's based out of both units. Right, or based out of Colexco Station. So with that testimony in front of the court, the court made a credibility determination, and that should not be subject to challenge on appeal. So the defense witnessed, and I had a portion of my brief where I addressed that, it shouldn't discount probable cause. A couple other factors that weren't mentioned. In this Vasquez-Gonzalez case, there was a black tarp concealing the entire interior rear cargo area of the car. And that is a very important fact because Agent Baleeni testified that in his experience, that fact is exclusive to cars that were later found to have drugs. And that's at Vasquez's search of record, pages 52 and 137. Now, one of the points, when I first came out of that. That's the tarp. The tarp, exactly. And when I first heard that and I read Mr. Kajan's brief, before I realized this was an SUV, I thought, well, let's say you have an open bed pickup truck. It doesn't sound so unreasonable to have a tarp protecting the back. And I think he points out in his brief, you might want to protect thus from getting it somewhere. But this isn't an open bed pickup truck. In fact, supplemental to record page 4, we have a picture of this vehicle. It's an enclosed SUV. It's very uncommon to have a tarp blocking off something that already has the protection of the body of the vehicle. And whether you or I believe as much, again, he's testified that in his experience, that fact is exclusive, not just common, but exclusive to vehicles that have had drugs. Never addressed in the reply briefs. And finally, a couple other facts. Addressed in the reply briefs. These facts that go to probable cause. He testified that the rear windows and the passenger windshield area is totally blacked out. It's another experience that in his experience is common to load cars. And finally, this is one thing. This car ran through a stop sign. It had actually a vehicle code violation. So if you take this whole constellation of facts, it overwhelmingly supplies probable cause. Now, one of the themes of Mr. Kajan's presentation, and I don't dispute it, it's evident from the case law, when you talk about probable cause, you don't want to have broad profiles that can trap many innocent drivers. I would submit to Your Honors that in the facts of not only this case but the one that was just argued, these constellations of factors do not trap thousands of law-guiding users. In fact, I'm glad that these cases were heard in conjunction. It's quite telling. In these cases, who are the two people that are or who are the cars that were pulled over? The one car that's the only car out there on Super Bowl Sunday and the one car that's the only car out there on June 14th when there's 110-degree weather. These are not the facts which speak of thousands of law-abiding travelers falling under a broad profile. These are not rote factors that Your Honors see in other cases. These are highly detailed, specific testimony about this case. So as far as cause, again, we still believe that the reason that the border search law applies, that even if you hold us to the higher level, there can be no doubt that there's probable cause. And the last thing I want to point out, Your Honor, on the use of excessive force. This is another thing. If I leave here today and you take nothing else from this, these agents are testifying in this little unique corner of the world that when they light up cars, they fail to yield. We have the testimony I referenced earlier in the Cotamora case. We also have it in the Vasquez-Rosales case. Breyer. Is that when they light up cars? Carvin. Yeah, using the sirens and the lights. That's sort of the shorthand. I mean, the first we're talking about preemptive use of the lights and sirens. At Vasquez's excerpt of record, page 57, agent Boundary testified, it's common for smugglers to cross the interstate and to drive into oncoming traffic or drive erratically or drive 30 or 40 miles per hour beyond the speed limit. So we started using the spikes in the first instance because we had injuries and crashes and deaths from pursuits. Whereas with the controlled tire deflation device, there are flat tires within a tire. The defense would characterize that as the subjective beliefs of the agent. It's not. Well, the spikes go through into the tire. And then the spikes, the point of metal stays in the tire. Comes off, right. Comes off. But it stays in the tire. And it lets the air out at a gradual rate. So it's like a slow leak. Exactly. And how long does it take? He testified, the car can go within a half a mile. And that's what happened in both of these cases. So it's just a boom that just takes a half mile for the air to be expelled. Exactly. And it's not even a boom. It's a light bump. That's what Agent Vega Torres testified. I just want the people to know how this works. You know, it's something. And the final point, Your Honors, I'll make this brief. Hernandez-Garcia, I litigated that case eight years ago at the appellate level. Mr. Kajan was the trial lawyer. I think both cases here today have tried to characterize Hernandez-Garcia as a failure-to-yield case. They tried us for saying there's no published authority ever upholding the use of a spike strip in the first instance. That is not the case with Hernandez-Garcia. It's evident not only from the opinion but from the brief that was filed in that case. In that case, they also had a confirmed crossing. The agents radioed for a spike strip to be laid down four or five miles ahead. And that's a 284 F-30, page 1137. And then what the opinion says is as the tram, the van, approached these strips, then the lights went on. And then the car immediately applied its brakes and tried to swerve. But the point is, there wasn't an opportunity, that wasn't a case where they decided we're going to light this, put our sirens on and see what the car does. They also in that case had already decided to stop them because like in this case, there was a confirmed border crossing. And in fact, the defense brief in that case points out, it's a 2001 Westlaw 340-93643, that it was only 10 to 20 seconds before the van in that case hit the mat that the lights went on. And then that brief goes on to say that pursuing agent, the only reason he flashed his lights wasn't even to try to pull over that van, but to let the agent know this is the one that we want. So that is not a case where there was a failure to yield. That case is in no ways different from here. So Your Honors already have precedent that applies to this situation. And finally, also what was argued in that case are the exact same arguments that the defense is putting before Your Honors, which is that as a matter of public policy, the mock notice rule should be extended to cars. As part of the published opinion, this Court already rejected that argument. And granted, it didn't give four or five paragraphs of analysis. It was rather short. We, of course, would submit that four or five paragraphs of analysis aren't required because that's the correct view of the law. But when you look at the briefs and the arguments in that case, every single argument that's before this Court today was raised in that case. We somehow need to avoid this damages to property or damages to possible danger to life. This Court already eight years ago rejected that. In the interim, there's no evidence to revisit that ruling. Three separate defendants in these two cases this morning, three separate lawyers, no compelling reason to go against Hernandez-Garcia. Unless there are any further questions, I appreciate the Court's indulgence and I will submit. Thank you. Good morning again. The government says that this was Super Bowl Sunday and this was the only car out there, but that's not what the record says. The agent in this case, when you say on page 43 of the ER, and I say this because I want to make clear that I cited to these things correctly. And in the ER, the agent when asked, so during the morning you were surveilling this area and when you say legitimate vehicle traffic, what do you mean? There were people recreationally driving four-wheel all-terrain vehicles and there were vehicles parked there. Maybe six or eight trucks with campers or RVs, people that were camped there. So it's not that Mr. Vasquez's car was the only vehicle out there. That's not true. That's in the campground where those cars were. That's right. And not on Highway 8. He's talking on Highway 8. There was very little traffic. There was. That's true. There was very little traffic. But there was traffic and it's not what. Mr. Rady said that this was the only car out there and that's not the case. It's not that it was the only car out there. There's two cases that I think are important here, at minimum two cases. One is United States v. Rodriguez, 976 F. 2nd, 592. In that case, the court listed the following factors which purported to support the stop. Interstate 8 was a notorious route for alien smugglers, which is, I realize this is a drug case, but in the same way, Mr. Rady says that this area is notorious for smuggling activity. And in Rodriguez as well, the court said Interstate 8 is notorious for smuggling activity. Rodriguez failed to acknowledge the agents when he passed by them. That's not this case. Rodriguez looked back at the agents in his rearview mirror, swerved slightly in his lane. The vehicle appeared heavily loaded when going over bumps and Mr. Rodriguez was a Hispanic male. The court said that we believe that the factors cited here describe too many vehicles to create a reasonable suspicion this particular defendant was engaged in criminal activity. In here, like I said, like I've argued, we have an individual who's using the recreational campgrounds, meaning driving his SUV in the campgrounds, without the red flag, which the testimony reveals is consistent with other innocent users. I grant it. Some people do have them and some people don't. But that's not probable cause to deflate their tires. And I think, and Mr. Johnson can continue on this topic, but it's not that these tires slowly deflate and there's no potential for injury. The reality is that soon after the deflation, the spike strips caused the vehicle to drive on its rims. And in the Cota case, the car slammed into the median. So it's not that, I don't think it's objectively reasonable to say that the tires slowly deflate and there's no cause for injury. It's, especially in this particular case, the car slammed into the median. But also important is United States v. Coral Valenciano, 753 F. 2nd, 785. The car was stopped at 5.15 a.m. in a remote area, .6 miles from the Mexican border, an area well known for illegal smuggling. The defendant was nervous, a blank title was produced, and the registration for the vehicle when it was stopped. The facts known to the customs agents at the time that they stopped Coral were insufficient to make them reasonably certain that anything had been smuggled across the border and put in his car. That's at 788. And so if .6 miles from the border is insufficient, and in here, with the other facts in the case, we would submit that it was insufficient to cause a seizure in this case. Thank you. How about the information that the vehicle had not been modified so that there was only one way that it could come in into this area, and that would be by crossing the border? In terms of whether the vehicle was modified or not, the evidence at the district court was that there were unmodified SUVs that used this area for recreational activities as well. That's the first point. And then secondly, the agent on page 106 was asked whether he radioed anybody, because the point is, is he reasonably certain anyone crossed? And I already cited to the court that he acknowledged that he did not see them cross. And so the next obvious question is, well, did you radio anyone? And on page 106 was that he stated, and there's no objective facts that you radio people to find out if they saw anybody in that valley, is there? No, sir. You didn't hear any reports, right? That's correct. You didn't actively call everyone and say, have you seen a white SUV cross the border, did you? No, I didn't. Okay, you didn't call the Yuma Border Patrol Station. No, sir, I didn't. You didn't call the two Yuma Border Patrol SUVs that had gone into the A7 Valley, did you? No, sir. And so if what's left is no, sir, he hadn't received any reports, and he hadn't seen anybody physically, he personally hadn't seen anybody cross the border, then all we have left is a hunch. And certainly a hunch is not a reasonable, particularized suspicion as to criminal activity to allow an investigator to stop and also not a probable cause to arrest. All right. Thank you. All right, this matter will stand submitted, and we're going to take a brief recess at this time.
judges: Pregerson, Thompson, Fogel